# In the United States Court of Federal Claims

No. 20-784C
(Filed June 16, 2022)

| | |
|---|---|
| **LAURA KOLB, et al.,** | Randolph-Sheppard Act; |
| *Plaintiffs*, | RCFC 12(b)(1); |
| | Mandatory Arbitration; |
| v. | Implied-In-Fact Contract |
| **THE UNITED STATES,** | |
| *Defendant*. | |

*Fazeel S. Khan*, Haynes Kessler Myers & Postalakis, Incorporated of Worthington, Ohio, for plaintiff. *Eric B. Hershberger*, Haynes Kessler Myers & Postalakis, Incorporated, of counsel.

*Jimmy S. McBirney*, Trial Attorney, Commercial Litigation Branch, United States Department of Justice, Washington D.C., for defendant.

## OPINION AND ORDER

**FUTEY**, Senior Judge.

Plaintiffs Laura Kolb and Yvette Shackleford (the Vendors), are blind vendors who have been licensed to provide vending services on federal property through a state-federal partnership established pursuant to the Randolph-Sheppard Act (RSA), 20 U.S.C. §§ 107 *et seq.* (2018). The RSA limits the purposes for which funds that vendors earn may be set aside. The Vendors allege that the government committed illegal exactions and breached implied-in-fact contracts by collecting commissions from the gross income generated by their vending facilities, for purposes not permitted by the RSA. The Vendors filed a complaint in this court, seeking money damages equal to the commissions they have paid to the government over the past six years. The government moved to dismiss the case under Rule

12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC), arguing that this court lacks subject-matter jurisdiction over the matter because the Vendors failed to exhaust administrative remedies provided for in the RSA and because there is no contract between the government and the Vendors that could bring the claim within the purview of the Tucker Act, 28 U.S.C. § 1491 (2018).  The government also moved to dismiss under RCFC 12(b)(6), arguing that the Vendors failed to state a claim for breach of an implied-in-fact contract.

# I.  BACKGROUND

## A.  Statutory and Regulatory Context

The RSA is a federal statute that is intended to "provid[e] blind persons with remunerative employment, enlarg[e] the economic opportunities of the blind, and stimulat[e] the blind to greater efforts in striving to make themselves self-supporting," by establishing a system by which blind Americans may become licensed to provide vending services on federal property.  20 U.S.C. § 107.  In order to achieve this, the RSA and its implementing regulations establish a regime in which the Secretary of Education designates, for each state, a state licensing agency (SLA) "to issue licenses to blind persons who are citizens of the United States for the operating of vending facilities on Federal and other property in such State for the vending of newspapers, periodicals, confections, tobacco products, foods, beverages, and other articles or services," *Id.* § 107a(a)(5).

The SLAs form contracts with state and federal agencies for the rights to operate vending facilities, and form contracts with licensed blind vendors, assigning them those rights.  The RSA allows SLAs to set aside certain funds from the vending facilities they oversee, but only for limited purposes:

> "[I]f any funds are set aside, or caused to be set aside, from the net proceeds of the operation of the vending facilities such funds shall be set aside, or caused to be set aside, only to the extent necessary for and may be used only for the purposes of (A) maintenance and replacement of equipment; (B) the purchase of new equipment; (C) management services; (D) assuring a fair minimum return to operators of vending facilities; and (E) retirement or pension funds, health insurance contributions, and provision for paid sick leave and vacation time."

20 U.S.C. § 107b(3).  *See also* 34 C.F.R. § 395.9(b).

The RSA and its implementing regulations establish different procedures and processes for individual vendors grievances and complaints brought by SLAs.  In any action brought by a vendor before either an SLA or the Secretary of Education they are required "to provide to any blind licensee dissatisfied with any action

arising from the operation or administration of the vending facility program an opportunity for a fair hearing, and to agree to submit the grievances of any blind licensee not otherwise resolved by such hearing to arbitration."  20 U.S.C. § 107b(6); 107d-1(a).

The section of the RSA relating to grievance procedures contains two provisions, one for claims brought by vendors, the other for those brought by SLAs. The one titled "Hearing and arbitration," provides procedures for complaining vendors.  It provides that "[a]ny blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a [SLA] a request for a full evidentiary hearing, which shall be provided by such agency . . . If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute . . . and the decision of such panel shall be final and binding on the parties except as otherwise provided in [the RSA]."  *Id.* § 107d-1(a).  The corollary federal regulation is similar, but specifies that SLAs are required to provide hearing procedures for "each blind vendor … dissatisfied with any *State licensing agency action* arising from the operation or administration of the vending facility program," 34 C.F.R. § 395.13(a) (emphasis added), rather than the statute's broader wording of "*any action* arising from the operation or administration of the vending facility program."  20 U.S.C. § 107d-1(a) (emphasis added).

The RSA's second complaint provision provides procedures for disputes brought by SLAs and is titled "Noncompliance by Federal departments and agencies; complaints by State licensing agencies; arbitration."  It provides that "[w]henever any [SLA] determines that any department, agency, or instrumentality of the United States that has control of the maintenance, operation, and protection of Federal property is failing to comply with the provisions of this chapter or any regulations issued thereunder . . . such licensing agency may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute . . . and the decision of such panel shall be final and binding on the parties except as otherwise provided in [the RSA].  *Id.* § 107d-1(b).

The RSA's section on arbitration provides different procedures for panels convened by the Secretary of Education "to hear grievances of blind licensees," *id.* § 107d-2(b)(1), and panels convened "to hear complaints filed by a State licensing agency."  *Id.* § 107d-2(b)(2).  Arbitration panels convened under the vendor-grievance provision of the RSA and its implementing regulation are to consist of a member designated by the vendor, a member designated by the SLA, and a neutral chairperson on whom the two parties agree.  *Id.* § 107d-2(b)(1).  *See also* 34 C.F.R. § 395.13(a).  Panels convened under the SLA-complaint provision and its implementing regulation are to consist of a member designated by the SLA, a member "designated by the head of the Federal department, agency, or

instrumentality controlling the Federal property over which the dispute arose," and a neutral chairperson on whom the two parties agree.  20 U.S.C. § 107d-2(b)(2).  *See also* 34 C.F.R. § 395.37(b).

## B. Procedural History

The Vendors are blind persons who are licensed by Ohio's SLA, the Bureau of Services for the Visually Impaired (BSVI), to provide vending services to Defense Supply Center Columbus (DSCC), a federal property.[1]  The BSVI formed a bureau-grantor agreement (BGA) with DSCC for the provision of vending services in various facilities on the property, in which the BSVI agreed "[t]o pay to the DSCC non-appropriated fund activity a commission of 4.8% of gross revenue after taxes from all present and future BSVI operations" in the DSCC buildings at issue.  Pls.' Not. of Filing of Exs. (ECF No.18) (Plaintiffs' Exhibits) 2.[2]  Vendors Laura Kolb and Yvette Shackleford signed bureau-operator agreements (BOAs) with the BSVI in 2014 and 2010, respectively, permitting them to operate vending facilities on DSCC. These BOAs require Vendors to "[c]omply with all provisions of the Ohio Administrative Code Chapter 3304:1-21, including but not limited to operating the [BSVI] Facility in accordance with said Administrative Code, [BGA], facility permit(s), and any other agreements related to the facility."  *Id.* at 3, 9.  The BOAs further require the BSVI to "[c]omply with all provisions of the Ohio Administrative Code Chapter 3304:1-21 as it relates to the relationship between [the BSVI] and the Operator."  *Id.* at 4, 10.  Chapter 3304:1-21 of the Ohio Administrative Code establishes and outlines the operation of the BSVI.  It includes a requirement that operators "[o]perate facilities in accordance with the BGA or permit," and "[o]perate the facility in accordance with the requirements of the administrative rules, BOA, . . . BGA, facility permit, or other agreement for that facility."  The Code also authorizes the BSVI to terminate a BOA for "[f]ailure of the operator to pay any fee

---

[1] The BSVI is a division of Opportunities for Ohioans with Disabilities, a state agency that aims to "empower [ ] Ohioans with disabilities through employment, disability determinations, and independence."  Opportunities for Ohioans with Disabilities, https://ood.ohio.gov/wps/portal/gov/ood/home (last visited Nov. 4, 2021). The BSVI administers the Business Enterprise Program, which handles Ohio's program for blind vendors, among other programs.  Opportunities for Ohioans with Disabilities, *Business Enterprise Program*, https://ood.ohio.gov/wps/portal/gov/ood/about-us/programs-and-partnerships/business-enterprise-program (last visited Nov. 4, 2021).  Although each of these entities is referred to separately in the parties' filings and exhibits, the Court will refer to the BSVI throughout because it is Ohio's SLA.

[2] With the exception of the complaint, citations to Vendors' filings are to Electronic Case Filing System (ECF) page numbers.

required through the BOA, BGA, or permit."  Ohio Admin. Code § 2204:21-1. Because the BGA requires DSCC to receive a 4.8 percent commission on sales, and the BOA and state regulation require vendors to act in accordance with the BGA, Vendors have paid these commissions directly to the government.  Complaint ¶¶ 29–31, 37.

In the spring of 2020, both Vendors filed grievances with the BSVI, arguing that the 4.8 percent commission imposed by the BGA is unlawful.  Pls.' Notice of Filing Supplemental Evidence (ECF No. 20) (Plaintiffs' Evidence) 4–5, 9–10, 48–49.[3] Although Ms. Shackleford only implicitly referred to the RSA, Ms. Kolb complained that "[t]he Randolph Shepard Act does not authorize use of a vendor's funds to pay commissions to a grantor" and argued that the 4.8 percent commission on gross sales required by the BGA between the BSVI and DSCC violates the RSA's limitation on purposes for which "funds [may be] set aside, or caused to be set aside, from the net proceeds of the operation of the vending facilities."  *Id.* at 4–5 (quoting 20 U.S.C. § 107b(3)).  The Vendors requested that the BSVI stop the obligation to pay commissions and reimburse or recover the amounts already paid to DSCC.  *Id.* at 9–10, 49.  Both complained that the BSVI "failed in its duty to advocate on [their] behalf by requiring [them] to continue to pay commissions and failing to take action on [their] behalf to prevent any further obligation on [their] part to pay commissions that are both illegal and an extreme financial burden."  *Id.* at 9, 48.  The BSVI refused each of these grievances, explaining that it only had jurisdiction over grievances filed within 45 days from the date a licensee becomes or reasonably should become aware of an action taken against a licensee.  *Id.* at 6, 8, 11–13, 50. *See also* Ohio Admin. Code § 3304:1-21-14(A).  The Vendors then filed grievances regarding the process by which the BSVI determined that the initial grievances were time-barred.  Plaintiffs' Evidence. at 14–16, 41.[4]

---

[3] Grievances from Ms. Kolb regarding the commission payments are dated March 31 and May 7, 2020.  A single grievance on the subject from Ms. Shackleford is dated May 7, 2020.  Plaintiffs' Evidence 4, 9, 48.  Vendors' complaint, and correspondence within their exhibits, refer to prior outreach to the BSVI about commission payments.  *See, e.g.,* Complaint ¶ 6; Plaintiffs' Evidence 4–5, 9–10.  This correspondence is not in the record, but is not necessary to the Court's consideration of this case.

[4] The grievance from Ms. Kolb on this matter is dated June 11, 2020.  Plaintiffs' Evidence. at 14.  The BSVI conducted hearings on this issue.  *Id.* at 30–47.  A scheduling order from the hearing officer notes Ms. Kolb and Ms. Shackleford as two of thirteen grievants whose grievances were consolidated on the issue of whether the BSVI "ha[s] the authority to deny, without a hearing, a grievance (submitted pursuant to OAC 3304:1-21-14), that, in [BSVI's] sole opinion . . . is not timely; or concerns a ministerial matter or otherwise is not appropriate for hearing."  *Id.* at 41–42.  The hearing officer indicated that each grievant would

- 5 -

While their state-level administrative proceedings on the issue of the BSVI's authority to refuse grievances were still pending, and without having requested arbitration by the Department of Education, the Vendors filed the complaint in the present case, on June 26, 2020. *See* Complaint. They make two claims: first, they claim that the requirement to pay a commission to DSCC is an illegal exaction by the government, and second, they claim that the commission payments constitute a breach of an implied-in-fact contract between the government and themselves. Complaint ¶¶ 10, 12. The Vendors seek damages equal to the respective commissions that they claim have been illegally exacted from them over the past six years. *Id.* at 13. Defendant moved to dismiss the case under RCFC 12(b)(1), arguing that this court lacks subject-matter jurisdiction over the matter because the Vendors failed to exhaust administrative remedies and because there is no contract between the government and the Vendors that could bring the claim within the purview of the Tucker Act. Defendant's Motion to Dismiss (Defendant's Motion) 5–7. Defendant also moved to dismiss under RCFC 12(b)(6), arguing that the Vendors failed to state a claim for breach of an implied-in-fact contract. *Id.* at 7–8. Vendors filed a response to the government's motion on November 12, 2020. Plaintiffs' Memorandum in Opposition to Defendant's Motion to Dismiss (ECF No. 12) (Plaintiffs' Opposition). Defendant replied in turn on November 30, 2020. Defendant's Reply in Support of Motion to Dismiss (ECF No. 13) (Defendant Reply). Oral argument was conducted on September 14, 2021. Tr. of Oral Arg. (ECF No. 23).

## II. DISCUSSION

### A. Legal Standards

The government's assertion that this Court lacks subject-matter jurisdiction over Vendors' claims under RCFC 12(b)(1) rests primarily on the argument that the Vendors have not exhausted their administrative remedies as provided by the RSA. Defendant's Motion 5. Defendant points to precedent that, it argues, stands for the proposition that a vendor is required to file a grievance with an SLA and then request arbitration by the Secretary of Education before a vendor may seek relief from this Court for a violation of the RSA. Defendant's Motion 4–6; Defendant's Reply 1–5.

Under either RCFC 12(b)(1) or 12(b)(6), the Court normally accepts as true all factual allegations in the complaint and draws all reasonable inferences in a

---

receive an individual report and recommendation, *id.* at 44, and eventually recommended that Ms. Kolb's grievance regarding the time bar be denied. *Id.* at 40. No such report regarding Ms. Shackleford and no final order regarding either is in the record.

light most favorable to the pleader. *See Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Inter-Tribal Council of Arizona, Inc. v. United States*, 956 F.3d 1328, 1338 (Fed.Cir. 2020); *Englewood Terrace Ltd. P'ship v. U.S.*, 61 Fed.Cl. 583, 584 (2004). Vendors assert that jurisdiction is proper under the Tucker Act, which provides that the court has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages." Complaint. ¶ 5 (quoting 28 U.S.C. § 1491(a)(1)). The Vendors add that they are not required to arbitrate because RSA provides no mechanism by which a vendor may bring an arbitration claim against a federal grantor, *id.* ¶ 6, and that their illegal exaction claim is not arbitrable. Plaintiffs' Opposition at 2–3.

The United States Court of Appeals for the Federal Circuit (Federal Circuit) considered whether or not the RSA's arbitration procedure is a mandatory bar to this court's jurisdiction in *Kentucky v. United States*, 424 F.3d 1222 (Fed. Cir. 2005) (*Kentucky*). In that case, an SLA filed a post-bid protest—without first seeking arbitration—claiming that the government violated the RSA by failing to give it preference before eliminating its bid from the competitive range for a vending contract. In affirming the dismissal, the Federal Circuit held that claims alleging a breach of the RSA itself, such as the bid protest before it, required mandatory arbitration before they could be brought in the Court of Federal Claims. *Kentucky*, 424 F.3d at 1226, 1229.[5]

In *Oklahoma v. United States*, the state of Oklahoma and its SLA sought a temporary restraining order (TRO) in the course of a post-award bid protest against the Army. 144 Fed. Cl. 263 (2019). After an initial complaint that alleged violations of the RSA, the SLA filed an amended complaint that "omitted any reliance on the [RSA], and . . . advance[d] four purely bid protest claims against the government." *Id.* at 268. The court stated that "[t]he case law is unequivocal that the Court of Federal Claims lacks Tucker Act jurisdiction whenever a plaintiff alleges that a federal agency violated the [RSA] or its attendant regulations and the plaintiff has yet to arbitrate those claims," *id.* at 275 (internal quotations omitted) (collecting cases). But it decided that, because the SLA had dropped its reliance on the RSA in its amended complaint, the "case [did] not fit within that established pattern," and concluded that the court had jurisdiction over the matter as a violation of the RSA was no longer at issue. *Id.* at 275–76.

## B. Vendors' Claims are Subject to Mandatory Arbitration under the RSA

---

[5] The Court of Federal Claims, in a decision by Judge Lawrence Block, had dismissed the bid protest on a slightly broader theory of the RSA's jurisdictional bar. *Kentucky v. United States*, 62 Fed. Cl. 445, 462–64 (2004),

The Vendors argue that their claims are not subject to the arbitration requirement because they are brought by on their own behalf, not by an SLA, and because they allege an illegal exaction and breach of contract, rather than a violation of the RSA. They content that their "illegal exaction claim . . . is not arbitrable as a matter of logic and law," and emphasize that the Court of Federal Claims has exclusive jurisdiction over illegal exaction claims for which the amount in controversy exceeds $10,000. Plaintiffs' Opposition at 2–3. But the relevant question is only whether the claim "allege[s] a violation of the RSA" and therefore "fall[s] within the scope of RSA-prescribed arbitration." *Kentucky*, 424 F.3d at 1227. Vendors' illegal exaction claim falls squarely within the ambit of this rule, as the sole grounds for the purported illegality of the commissions is the RSA itself. See Complaint. ¶¶ 43, 45 47 (citing 20 U.S.C. § 107b(3)). Such a claim is self-evidently based on the RSA.

Vendors' breach of contract claim is similarly based on an allegation that the government violated the RSA. Complaint ¶ 51. A breach-of-contract claim could be brought in this court, without the need to first arbitrate it, provided that such claim did "not allege a violation of the [RSA]." *Colo. Dep't of Hum. Serv.*, 74 Fed.Cl. at 345 (2006). Again, the sole grounds for the Vendor's claim that defendant breached their purported implied in fact contract is that it contained a term that was a violation of the RSA. Complaint ¶ 51. Though it is not obvious how this could state a breach of contract claim, whatever claim it would state would be based on the RSA. Accordingly, Vendors breach of contract claim is also based on the RSA and subject to its arbitration requirements.

In the alternative, Vendors argue that, even if SLAs are subject to a mandatory-arbitration rule, such a rule does not apply to vendors who seek to complain about federal agency action under the RSA. Plaintiffs' Evidence 4–5. They contend that both *Kentucky* and *Oklahoma* arose from litigation brought by an SLA on its own behalf and neither mentions claims brought by individual vendors against the federal government. *Id.* at 4. Although Vendors are correct that *Kentucky* and *Oklahoma* did not directly address § 107d-1(a), the vendor grievance provision of the RSA, the language and reasoning of those cases applies equally to both. The Vendors' contend that when the Court in *Kentucky* said that the RSA's mandatory arbitration provision applies "only" to SLAs complaint about violations of the RSA, that "only" was modifying "complaints brought by SLAs." Plaintiffs' Opposition at 5. As *Kentucky* was a case brought by an SLA, the only question before the court was the scope of claims to which the RSA's arbitration requirement applied, not scope of potential plaintiffs to whom that requirement applied. *See Kentucky*, 424 F.3d at 1225.

In fact, both courts elsewhere treat vendors and SLAs similarly in analyzing the contours of the obligation to exhaust administrative remedies. The Federal

Circuit in *Kentucky* noted that "it would be odd to interpret the statute to direct *vendors and state licensing agencies* into arbitration even if their complaints had nothing to do with a federal agency's violation of the RSA." *Id.* (emphasis added). The *Oklahoma* court similarly found that "[t]he case law is unequivocal that the Court of Federal Claims lacks Tucker Act jurisdiction whenever a plaintiff alleges that a federal agency violated the [RSA] or its attendant regulations and the plaintiff has yet to arbitrate those claims," without differentiating between vendor or SLA plaintiffs. *Oklahoma*, 144 Fed. Cl. at 275 (internal quotations omitted).

In addition to their arguments related to precedent, the Vendors also make an argument based on the structure of the RSA's arbitration regime and the language of its implementing regulations. While the RSA provides a right to a hearing for "[a]ny blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program," 20 U.S.C. § 107d-1(a), implementing guidance specifies that SLAs are required to provide hearing procedures for "each blind vendor … dissatisfied with any *State licensing agency action* arising from the operation or administration of the vending facility program," 34 C.F.R. § 395.13(a) (emphasis added). Additionally, the Vendors point out, arbitration panels convened to address vendor grievances are required only to include representatives for the vendor and the SLA, and a neutral chairman. *Id.* § 107d-2(b); 34 C.F.R. § 395.13(d). Given the narrower language in the C.F.R. provision and the absence of any arbitration provision as between a vendor and a federal agency, Vendors argue that arbitration would be wasteful because the federal government would neither be involved nor bound by the decision. Plaintiffs' Opposition at 3.

Although Vendors claim that requiring arbitration with the SLA would leave vendors without recourse when the government violates the RSA, Vendors own actions in this case demonstrate that they still have opportunities to seek redress of grievances through RSA arbitration. Both Vendors filed grievances complaining that the BSVI "failed in its duty to advocate on [their] behalf." Plaintiffs' Evidence 9, 48. Indeed, courts considering the RSA's arbitration provisions have emphasized the right of vendors, after an evidentiary hearing, to bring SLAs to arbitration in order to attempt to persuade them to take action against a federal agency for RSA violations. *See Ga. Dep't of Hum. Res. v. Nash*, 915 F.2d 1482, 1488 (11th Cir. 1990) (holding that subsection (a) of 20 U.S.C. § 107d-1 "guarantees the vendor an opportunity to convince the state agency to take action—to file a complaint pursuant to subsection (b)—even though the agency has discretion not to act"). *See also Ala. Dep't of Rehab. Serv. v. U.S. Dep't of Veterans' Aff.*, 165 F.Supp.2d 1262, 1267 (M.D. Ala. 2001) (describing vendors' "opportunity to convince a [SLA] to take action" through subsection (a)); *Sauer v. U.S. Dep't of Educ.*, 2010 WL 986774 (C.D. Cal. Mar. 17, 2010) (finding enforceable a § 107d-1(a) arbitration panel's order that an SLA pay damages to a vendor for the SLA's failure to sue a federal agency that had eliminated the vendor's vending facility); *Ga. ex rel. Ga. Vocational*

- 9 -

*Rehabilitation Agency v. Spencer*, 398 F.Supp.3d 1330, 1357 (S.D.Ga. 2019) (describing a SLA's actions to "pursue its rights in arbitration on behalf of itself and [a vendor]"). This right is not without substance. The language of the RSA's vendor and SLA provisions is essentially identical, and the precedent is clear that the SLA provision creates a mandatory predicate to this court's jurisdiction. The additional administrative burdens on vendors who take issue with federal agencies is not a sufficient reason to interpret the vendor provision as imposing less of an obligation.

Lastly, Vendors point to *State v. United States*, 986 F.3d 618, 622 (6th Cir. 2021) as a supporting both their claim on the merits and indicating that forcing them into arbitration may leave them without an effective remedy. See Plaintiff's Notice of Supplemental Authority. In that case the United States Court of Appeals for the Sixth Circuit held that a commission scheme similar to the one challenged here by Vendors was a violation of the RSA. *Id.* at 624–625. As the motion before the Court does not concern the merits of the claim, however, that is of no relevance. Concerning the question of remedy, in that case the plaintiffs were left without a retrospective remedy because the entity which received (and retained) the improper commissions was a state entity entitled to immunity under the Eleventh Amendment. *Id.* at 629–630. Whether the Vendors would be able to obtain complete relief in an arbitration before the SLA, the Department of Education, or post arbitration litigation is a question for another day, and one on which the Eleventh Amendment obviously has no bearing. Accordingly, *State* is irrelevant to the motion before the Court.

As the vendors have failed to exhaust the required arbitration remedies under the RSA, therefore the Court must dismiss their claims for breach of an implied-in-fact contract and for an illegal exaction for lack of subject-matter jurisdiction.

### III.  CONCLUSION

For the above stated reasons, defendant's motion to dismiss for lack of subject-matter jurisdiction is **GRANTED**.

The Clerk is directed to enter judgment accordingly.  No costs.

**IT IS SO ORDERED.**

s/ Bohdan A. Futey
**BOHDAN A. FUTEY**
Senior Judge